******************************************

The ''officially released'' date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the ''officially released'' date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

DEUTSCHE BANK AG *v.* CAROLINE VIK ET AL.
(AC 44586)

Elgo, Clark and Lavine, Js.

*Syllabus*

The plaintiff bank sought to recover damages for alleged tortious interference with business expectancy and violation of the Connecticut Unfair Trade Practices Act (CUTPA) (§ 42-110a et seq.), for the defendants' actions in connection with the plaintiff's attempt to collect amounts owed to it by S Co., which the plaintiff alleged was a shell company controlled by the defendant A. The plaintiff sought to enforce a judgment it previously obtained against S Co. in a different jurisdiction and alleged that the defendants deliberately interfered with a court-ordered sale of certain assets to satisfy that judgment by fabricating a document purporting to grant the defendant C the right of first refusal to acquire the asset, shares in a software company. The trial court denied the defendants' motion to dismiss the plaintiff's complaint, in which they claimed that the court lacked subject matter jurisdiction because the plaintiff's allegations arose out of communications made and actions taken in past judicial proceedings and were thus barred by the litigation privilege. On the defendants' appeal to this court, *held*:

1. The trial court erred in denying the defendants' motion to dismiss the plaintiff's claim for tortious interference with business expectancy, as the claim was predicated on communications made during and relevant to prior judicial or quasi-judicial proceedings: multiple paragraphs of the plaintiff's complaint included allegations concerning the defendants' participation in or commencement of legal actions or appeals, and the fact that the plaintiff characterized the defendants' alleged legal actions as conduct that was meritless, frivolous or an abuse of the legal system did not bring the conduct within the limited exception to the litigation privilege, as the cause of action of tortious interference does not challenge the purpose of the underlying litigation procedure; moreover, the plaintiff could have pursued other remedies to address the defendants' claimed abuses, including an abuse of process or vexatious litigation claim, but chose not to do so.

2. The trial court erred in denying the defendants' motion to dismiss the plaintiff's claim asserting a violation of CUTPA; the plaintiff's claim, premised largely on the defendants' alleged communications and conduct in prior judicial proceedings, including the alleged introduction of false and/or fabricated evidence and the alleged filing of false and/or frivolous actions and appeals, closely resembled CUTPA claims that courts in Connecticut consistently have held are barred by the litigation privilege.

3. Although the plaintiff's complaint included allegations unrelated to communications in the course of judicial proceedings, the litigation privilege barred those claims, as the complaint was permeated with allegations pertaining to the defendants' communications and participation in prior judicial proceedings, which were both central to the plaintiff's claims and inextricably intertwined with the allegations of extrajudicial conduct.

Argued February 14—officially released August 23, 2022

*Procedural History*

Action to recover damages for, inter alia, violation of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Hon. Edward T. Krumeich II*, judge trial referee, denied the defendants' motion to dismiss, and the defendants appealed to this court. *Reversed*; *judgment directed*.

*Monte E. Frank*, with whom was *Johanna S. Katz*, for the appellants (defendants).

*Thomas D. Goldberg*, with whom were *John W. Cerreta* and *Jennifer M. Palmer*, and, on the brief, *Michael Schoeneberger, David G. Januszewski,* and *Sheila C. Ramesh,* pro hoc vice, for the appellee (plaintiff).

*Opinion*

CLARK, J. The defendants, Alexander Vik (Alexander) and Caroline Vik (Caroline), appeal from the judgment of the trial court denying their motion to dismiss, in which they asserted that the claims brought by the plaintiff, Deutsche Bank AG, were barred by the litigation privilege. On appeal, the defendants claim that the court improperly concluded that the litigation privilege does not bar the plaintiff's claims of tortious interference with business expectancy and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. We agree and, accordingly, reverse the judgment of the trial court.

For purposes of this appeal, we take the facts as alleged in the complaint as true and construe them in a manner most favorable to the pleader. See *Tyler* v. *Tatoian*, 164 Conn. App. 82, 84, 137 A.3d 801, cert. denied, 321 Conn. 908, 135 A.3d 710 (2016). The plaintiff's complaint is comprised of 173 paragraphs of allegations relating to its long running attempt to collect on amounts owed to it by nonparty Sebastian Holdings, Inc. (SHI). The plaintiff alleges that SHI is a shell company, which until 2015, was solely owned and controlled by Alexander. Despite transferring his shares in SHI and resigning from its board of directors, Alexander continues to dominate and control SHI today. Since 2008, when SHI first became indebted to the plaintiff, Alexander, with other entities and individuals acting on his behalf, allegedly has employed various tactics to obstruct the plaintiff's collection efforts. These include, inter alia, concealing assets, fabricating documents, and undertaking fraudulent transfers. The plaintiff alleges that, in 2013, the Commercial Court, Queen's Bench Division of the High Court of Justice of England and Wales (English court) rendered a judgment ordering SHI to pay amounts due to the plaintiff (English judgment) and finding that Alexander had fabricated evidence and lied under oath. With interest, the plaintiff alleges that the amount of the English judgment now exceeds $300 million.

At all times, SHI has claimed that it lacks sufficient assets to satisfy the English judgment. The plaintiff alleges that, since 2013, it has vigorously sought to enforce the English judgment by undertaking a global enforcement effort, including the filing of actions in Connecticut, New York, Delaware, Pennsylvania, the United Kingdom, and Norway. Certain of these enforcement actions sought judgments declaring Alexander personally liable for the English judgment as SHI's alter ego. The complaints in those actions also detail Alexander's long history of shuffling and concealing assets from the plaintiff.

The plaintiff alleges that, in 2008, SHI found itself facing hundreds of millions of dollars in losses arising

from, among other things, risky trading on margin in the foreign exchange market. As a result of these losses, SHI faced margin calls from its prime broker, the plaintiff. Knowing that SHI faced large losses, the plaintiff alleges that, in October, 2008, Alexander caused SHI to transfer approximately $1 billion worth of assets out of SHI. As a result of the October, 2008 transfers, the plaintiff alleges that Alexander falsely claimed that SHI had insufficient assets, leaving the plaintiff with an unpaid debt of more than $235 million. The present action concerns one such asset: shares in a Norwegian software company, Confirmit AS (Confirmit). To that end, the plaintiff alleges that, in 2008, Alexander wrongfully caused SHI to transfer the shares in Confirmit to his personal account in order to keep those shares beyond the plaintiff's reach.

The plaintiff further alleges that the English court found that the shares of Confirmit were one portion of the approximately $1 billion of assets that Alexander drained from SHI to avoid paying the plaintiff the amount it is owed. The plaintiff claims that, in 2015, Alexander again purported to transfer those same shares, this time to his father, Erik Martin Vik (Erik), while the shares were the subject of litigation with the plaintiff. The plaintiff alleges that it sought an execution lien on the Confirmit shares in 2016. Following a lengthy legal battle, which included a full trial and appeals to the Norwegian Supreme Court, the plaintiff alleges that the Oslo Court of Probate, Bankruptcy, and Enforcement (Oslo enforcement court) invalidated both the 2008 and 2015 transfers of Confirmit shares. As a result, the shares reverted to SHI and were thus subject to enforcement. In April, 2016, the plaintiff filed a petition with the Oslo enforcement court to execute a lien on the Confirmit shares, which was ultimately granted by the court. On March 8, 2017, the plaintiff filed a petition seeking a forced sale of the Confirmit shares. Following a two year postponement due to the pendency of appeals regarding the execution lien, the plaintiff submitted a request to continue the enforcement process of the Confirmit shares on May 27, 2019. The plaintiff alleges that, on June 12, 2019, the enforcement officer issued a decision to commence the sale, and, on July 8, 2019, named nonparty ABG Sundal Collier ASA (ABG) as the sales assistant for the forced sale. Rather than allow the sale of Confirmit shares to proceed, the plaintiff alleges that the defendants and related parties engaged in a series of maneuvers designed to inject doubt and uncertainty into the sales process. The plaintiff alleges that these tactics included manufacturing false evidence, submitting a bad faith bid by Alexander to acquire Confirmit, and, importantly for present purposes, commencing frivolous legal actions and appeals.

The plaintiff alleges that, among the most egregious of these tactics, is the defendants' fabrication of a document purporting to grant Alexander's daughter, Caro-

line, a right of first refusal to acquire the Confirmit shares (ROFR). The plaintiff alleges that, upon information and belief, the ROFR was forged and backdated to enable the defendants to interfere with the court-ordered sale of Confirmit. With this allegedly false document in hand, the plaintiff alleges that Caroline proceeded to commence litigation in the United States District Court for the District of Connecticut against ABG seeking to enjoin the Confirmit sale midway through the bidding process. The District Court granted an ex parte temporary restraining order (TRO), and subsequently, with the consent of the parties, kept the TRO in place until December 6, 2019, pending a decision on Caroline's application for a preliminary injunction. The plaintiff alleges that, "[d]uring the proceedings in the District Court, [Alexander] submitted two affidavits in support of [Caroline's] application for an injunction. Those affidavits describe how [Alexander] personally attempted to participate in the Confirmit sales process and state that he had contacted ABG so that he could be considered a potential buyer in the process." After the District Court denied her application for a preliminary injunction on December 4, 2019, the plaintiff alleges that Caroline voluntarily dismissed her "frivolous action." The plaintiff alleges that two days later, on December 6, 2019, Caroline filed a separate but substantially similar petition for a preliminary injunction with the Oslo enforcement court, asking the court to stop any sale of the Confirmit shares that did not respect the ROFR agreement.

In support of its tortious interference with business expectancy claim, the plaintiff incorporates by reference the aforementioned allegations and further alleges, inter alia, that the defendants brought "frivolous," "meritless," or "baseless" legal claims or appeals in an effort to undermine or reverse the sale of Confirmit sales. The plaintiff further alleges that the English judgment formed a business relationship between the plaintiff and SHI insofar as the English court determined that SHI owed the plaintiff $235,646,355. The plaintiff alleges that it has sought to realize this business expectation by enforcing the English judgment in various jurisdictions, including in Connecticut. The plaintiff alleges that Caroline's lawsuits in Connecticut federal court and Norway were "timed specifically to interfere with the forced sale of the Confirmit shares and the business expectations of [the plaintiff]. . . . The execution and attempted enforcement of [Caroline's] sham ROFR on which she based her requests for an injunction was for the sole purpose of interfering with the forced sale of Confirmit, and had no proper purpose or justification." Among other allegations, the plaintiff alleges that "[Alexander] is the decision maker behind other nonparties' actions relating to Confirmit. This includes the continuous stream of meritless legal action that [Erik] . . . on behalf of SHI . . . ha[s] filed in Nor-

way." The plaintiff alleges that "[the] interference with the business of Confirmit, whether through manipulating the board of directors or prolonging the enforcement lien with adverse effects, is cumulative, and the ongoing legal battles are similarly detrimental." The plaintiff alleges that, as a result of the defendants' intentional interference with the plaintiff's business relationships and expectations, the market value of the Confirmit shares dropped from $150 million to $65 million.

In support of its CUTPA claim, the plaintiff incorporates all of its allegations in support of its tortious interference claim and, additionally, alleges that SHI's persistent refusal to pay the English judgment has forced the plaintiff to pursue multiple actions across various jurisdictions to enforce it. The plaintiff alleges that the defendants engaged in unfair methods of competition and unfair and deceptive acts to interfere with the sale of the Confirmit shares by filing for injunctions in both Connecticut and Norway on the false premise that Caroline genuinely sought to exercise her purported ROFR. The plaintiff further alleges that Alexander attempted to use the bidding process for the Confirmit shares to gather confidential information about the sales process and had no intention of following through on a legitimate bid. It alleges that "[Alexander] and his associates have targeted Confirmit, interfering with its business through the intentional prolonging of the enforcement lien and uncertainty of the company's ownership as well as through their continued and obstructionist litigation." The plaintiff alleges that the defendants' "conduct . . . constitutes a reckless indifference to and/or an intentional and wanton violation of [the plaintiff's] rights."

On October 22, 2020, in response to the plaintiff's complaint in the present case, the defendants filed a motion to dismiss the action on the basis of the litigation privilege. The defendants argued, inter alia, that the court lacked subject matter jurisdiction because the plaintiff's allegations arise out of communications made and actions taken in past judicial proceedings and are thus barred by the litigation privilege. On December 18, 2020, the plaintiff filed its opposition to the defendants' motion, arguing that there is no colorable basis for the court to dismiss the complaint in its entirety and that the motion should be denied.

On March 11, 2021, the court issued its memorandum of decision denying the defendants' motion to dismiss. It concluded, inter alia, "[t]hat part of the alleged misconduct included filing sham lawsuits and meritless appeals does not immunize [the] defendants' alleged conduct because the claims themselves are decidedly different than a defamation claim. The claims do not concern how the cases were litigated, or the words used in communications by litigants or advocates, but that the sham cases themselves were commenced and

maintained as part of a multifaceted scheme to avoid enforcement of the judgment. These claims are not akin to a defamation or fraud claim that focuses on communication of false information in the prosecution or defense of a lawsuit, but rather they allege improper use of the judicial system for purposes not intended to further the course of justice but rather to pervert the course of justice." In short, the court stated that the "underlying purpose of absolute immunity does not apply just as equally to the claims alleged as it does to the tort of defamation; the claims alleged are not more like defamation than vexatious litigation, but rather share more with vexatious litigation, malicious prosecution and abuse of process as a perversion of justice in support of objectives largely based on conduct outside the courtroom designed to achieve aims not consistent or achievable with lawful judicial remedies." This appeal followed.

The defendants argue that the trial court erroneously concluded that the litigation privilege does not bar the plaintiff's tortious interference and CUTPA claims. They contend that the court (1) misapplied binding authority that makes clear that the plaintiff's claims are subject to the protection of the litigation privilege, (2) erroneously determined that the plaintiff's allegations fell within the abuse of process exception to the privilege, despite the plaintiff not pleading an abuse of process claim, and (3) failed to recognize that the public policy behind the litigation privilege applies with equal force to the allegations in the plaintiff's complaint, regardless of the plaintiff's allegations that the past litigations were "meritless." For the reasons that we discuss herein, we agree with the defendants.[1]

We first set forth our standard of review. We review the trial court's ultimate legal conclusion and its resulting denial of dismissal de novo. See *Rioux* v. *Barry*, 283 Conn. 338, 343, 927 A.2d 304 (2007). In conducting this review, "we take the facts to be those alleged in the complaint, construing them in a manner most favorable to the pleader." *Beecher* v. *Mohegan Tribe of Indians of Connecticut*, 282 Conn. 130, 132, 918 A.2d 880 (2007). We are mindful that the doctrine of absolute immunity, also referred to as the litigation privilege, "implicates the court's subject matter jurisdiction"; *Dorfman* v. *Smith*, 342 Conn. 582, 594, 271 A.3d 53 (2022); and that "every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *Tyler* v. *Tatoian*, supra, 164 Conn. App. 87.

Turning to the merits of the appeal, we begin with a general overview of the litigation privilege. "Connecticut has long recognized the litigation privilege." *Simms* v. *Seaman*, 308 Conn. 523, 536, 69 A.3d 880 (2013). In recent years, our Supreme Court has detailed the history of that privilege; see, e.g., id., 531–45; and has applied it in a number of contexts. See, e.g., *Dorfman*

v. *Smith*, supra, 342 Conn. 585; *Scholz* v. *Epstein*, 341 Conn. 1, 3, 266 A.3d 127 (2021); *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 617, 79 A.3d 60 (2013); *Rioux* v. *Barry*, supra, 283 Conn. 340; *Hopkins* v. *O'Connor*, 282 Conn. 821, 823, 925 A.2d 1030 (2007). The litigation privilege was first recognized in response to the need to bar persons accused of crimes from suing their accusers for defamation. See *Bruno* v. *Travelers Cos.*, 172 Conn. App. 717, 725, 161 A.3d 630 (2017). It has since been applied to other causes of action, including claims brought pursuant to CUTPA and claims of intentional interference with contractual or beneficial relations. See, e.g., *Dorfman* v. *Smith*, supra, 585 (litigation privilege applicable to plaintiff's claims for breach of implied covenant of good faith, negligent infliction of emotional distress, and violation of CUTPA premised on business practice of filing false discovery responses); *Rioux* v. *Barry*, supra, 350 ("absolute immunity does bar the plaintiff's claim of intentional interference with contractual or beneficial relations").

In its most basic form, the litigation privilege provides that "communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy." (Internal quotation marks omitted.) *Hopkins* v. *O'Connor*, supra, 282 Conn. 830–31. This includes "statements made in pleadings or other documents prepared in connection with a court proceeding." (Internal quotation marks omitted.) *Scholz* v. *Epstein*, supra, 341 Conn. 28–29.

"[T]he purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 627. "[T]he possibility of incurring the costs and inconvenience associated with defending a [retaliatory] suit might well deter a citizen with a legitimate grievance from filing a complaint." (Internal quotation marks omitted.) *Craig* v. *Stafford Construction, Inc.*, 271 Conn. 78, 95, 856 A.2d 372 (2004). "Put simply, absolute immunity furthers the public policy of encouraging participation and candor in judicial and quasi-judicial proceedings. This objective would be thwarted if those persons whom the common-law doctrine was intended to protect nevertheless faced the threat of suit. In this regard, the purpose of the absolute immunity afforded participants in judicial and quasi-judicial proceedings is the same as the purpose of the sovereign immunity enjoyed by the state." *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865 A.2d 1163 (2005). As such, "courts have recognized absolute immunity as a defense in certain retaliatory civil actions in order to remove

this disincentive and thus encourage citizens to come forward with complaints or to testify." *Rioux* v. *Barry*, supra, 283 Conn. 344.

The litigation privilege is not without limits, however. Our Supreme Court has held that certain causes of action are not barred by the litigation privilege. See, e.g., *Simms* v. *Seaman*, supra, 308 Conn. 541–43, 546 (discussing claims of vexatious litigation and abuse of process). What generally distinguishes these causes of action from those to which the privilege attaches is that they "prohibit conduct that subverts the underlying purpose of the judicial process. Specifically, these causes of action prevent, or hold an individual liable for . . . the improper use of the judicial process for an illegitimate purpose, namely, to inflict injury upon another individual in the form of unfounded actions." *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 631. These causes of action are treated differently in part because of "restraints built into [them] by virtue of [their] stringent requirements."[2] *Rioux* v. *Barry*, supra, 283 Conn. 347–48; see also *Scholz* v. *Epstein*, supra, 341 Conn. 21 ("[t]he plaintiff's statutory theft claim . . . is distinguishable from a vexatious litigation claim because the elements of the claim do not provide any safeguards to prevent inappropriate retaliatory litigation"). For example, one element of a vexatious litigation claim is that the suit must have terminated in the plaintiff's favor.[3] See *Scholz* v. *Epstein*, supra, 21.

"Relevant to any determination of whether policy considerations support applying absolute immunity to any particular cause of action, [our Supreme Court] in *Simms* identified the following factors: (1) whether the alleged conduct subverts the underlying purpose of a judicial proceeding, in a similar way to how conduct constituting abuse of process and vexatious litigation does; (2) whether the alleged conduct is similar in essential respects to defamatory statements, inasmuch as a defamation action is barred by the privilege; and (3) whether the alleged conduct may be adequately addressed by other available remedies."[4] Id., 10–11. "In examining the competing interests and public policies at stake, our Supreme Court has focused on the need to ensure candor from all participants in the judicial process." *Tyler* v. *Tatoian*, supra, 164 Conn. App. 90.

I

With these principles in mind, we begin by addressing the defendants' contention that the court improperly concluded that the litigation privilege did not bar the plaintiff's tortious interference with business expectancy claim against the defendants. The defendants argue, inter alia, that the trial court failed to follow binding Supreme Court precedent that makes clear that the litigation privilege bars such claims. We agree.

As this court has observed: "Our Supreme Court has

held that absolute immunity bars claims based on tortious interference with business and contractual relationships when the alleged conduct occurred during the course of a judicial or quasi-judicial proceeding." *Law Offices of Frank N. Peluso, P.C.* v. *Rendahl*, 170 Conn. App. 364, 367, 154 A.3d 584 (2017), citing *Rioux* v. *Barry*, supra, 283 Conn. 351. In undertaking a careful balancing of the competing interests and public policies at stake, our Supreme Court in *Rioux* stated that the elements of a tortious interference claim "simply do not have the same stringency as those that are the hallmark of the elements of a claim for vexatious litigation. For this reason, insofar as the balancing that applies, this tort is more like defamation than vexatious litigation. Therefore, the same balancing test applies to it as applies to defamatory statements: if made in the course of a judicial or quasi-judicial proceeding, they are absolutely immune." *Rioux* v. *Barry*, supra, 351.

In light of our Supreme Court's holding in *Rioux*, it is clear that the trial court's judgment cannot stand. The trial court's conclusion that the litigation privilege does not apply to the plaintiff's tortious interference claim because it is more "akin to claims for vexatious litigation, abuse of process and malicious prosecution" is in direct conflict with our Supreme Court's decision in *Rioux*. In balancing the competing interests at stake, our Supreme Court in *Rioux* concluded that absolute immunity applies to such torts if the allegations supporting the claim are based on communications that took place in the course of a judicial or quasi-judicial proceeding. *Rioux* v. *Barry*, supra, 283 Conn. 351.

Because the litigation privilege is applicable to claims of tortious interference with business expectations if the claim is premised on communications or statements made in the course of prior judicial or quasi-judicial proceedings, the principal question for the trial court was whether the allegedly privileged communications or statements were in fact made in the course of judicial or quasi-judicial proceedings and relevant to the subject of the controversy. See *Hopkins* v. *O'Connor*, supra, 282 Conn. 838 (if "the communications are uttered or published in the course of judicial proceedings, even if they are published falsely and maliciously, they nevertheless are absolutely privileged provided they are pertinent to the subject of the controversy"). On appeal, the plaintiff argues that its claims do not arise out of the statements or communications made by the defendants in litigation because it is challenging the defendants' acts of filing certain actions and appeals. The plaintiff thus contends that its claims are based on the defendants' alleged wrongful *conduct* of filing frivolous and meritless actions and appeals, not any communications or statements in a judicial proceeding.

The defendants counter that the plaintiff has alleged that they commenced "frivolous actions," filed "mer-

itless appeals," and manufactured "false evidence." They note that the plaintiff alleges that Caroline's filing of an action seeking a temporary restraining order and preliminary injunction resulted in an interference with the business relations between the plaintiff and SHI. The defendants argue that these allegations strike at the very heart of the communications and actions before the Oslo enforcement court in Norway, the Borgarting Court of Appeal, the Supreme Court of Norway, and the United States District Court for the District of Connecticut. In their view, there can be no question that these actions fall within the scope of the litigation privilege. We agree with the defendants.

At least 30 paragraphs of the plaintiff's 173 paragraph complaint include allegations concerning the defendants' participation in or commencement of legal actions or appeals. Although the plaintiff argues that the act of filing an action or an appeal is not a communication in connection with a court proceeding, we can think of no communication that is more clearly protected by the litigation privilege than the filing of a legal action. The filing of a legal action, by its very nature, is a communicative act. See, e.g., *Scholz* v. *Epstein*, supra, 341 Conn. 28–29 (privilege applies to "*every step* of the proceeding until [its] final disposition . . . including to *statements made in pleadings* or other documents prepared in connection with a court proceeding" (citation omitted; emphasis added; internal quotation marks omitted)); *Rioux* v. *Barry*, supra, 283 Conn. 344 ("courts have recognized absolute immunity as a defense in certain retaliatory civil actions in order to remove this disincentive and thus encourage citizens to come forward *with complaints* or to testify" (emphasis added)).

Moreover, our case law does not speak about the privilege solely in terms of communications, but also in terms of *conduct* in the course of judicial or quasi-judicial proceedings. See *Simms* v. *Seaman*, supra, 308 Conn. 568–69 ("[w]e therefore conclude that the Appellate Court properly determined that attorneys are protected by the litigation privilege against claims of fraud for their *conduct* during judicial proceedings" (emphasis added)); *Hopkins* v. *O'Connor*, supra, 282 Conn. 830 ("[w]hether particular *conduct* is by its nature part of or in furtherance of a judicial proceeding for the purposes of triggering absolute immunity, however, depends on the particular facts and circumstances of each case" (emphasis added)).

In support of its claim that the litigation privilege applies only to communications and not conduct, the plaintiff points to our Supreme Court's decision in *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 616. In that case, the court concluded that absolute immunity did not bar a claim of employer retaliation pursuant to General Statutes § 31-290a[5] based on the employer's

filing of a lawsuit against the employee. Id., 617–18. The plaintiff seems to argue that, on the basis of this holding, the litigation privilege does not apply to the act of filing a lawsuit. That is not an accurate reading of *MacDermid, Inc.* The narrow issue in *MacDermid, Inc.*, was whether absolute immunity applied to an alleged violation of § 31-290a predicated on an employer's act of filing a lawsuit against an employee for the employee's exercise of his or her rights under Connecticut's workers' compensation law. Id., 625–26. In holding that the litigation privilege did not apply, the court concluded that applying "absolute immunity under [those] circumstances would serve only to incentivize retaliatory litigation and discourage employees from exercising their rights under the [Workers' Compensation] [A]ct, a situation the legislature clearly intended to prevent when it enacted § 31-290a." Id., 640. Nothing in *MacDermid, Inc.*, suggests that the act of filing a lawsuit in other contexts is beyond the scope of the litigation privilege.

The plaintiff further contends that its complaint "does not allege harm based on statements or communications uttered in the course of those proceedings, but for the wrongful conduct of abusing the judicial system to drive down the Confirmit shares' sale price." The fact that the plaintiff characterizes the defendants' alleged legal actions as "frivolous" or "meritless" or as "abusing the legal system" does not mean that it is beyond the litigation privilege. As this court explained in *Tyler*, "[t]he fact that the plaintiffs characterized the defendant's allegedly fraudulent conduct as an abuse of the legal system does not mean that it falls within the limited exception" to the litigation privilege. *Tyler* v. *Tatoian*, supra, 164 Conn. App. 93. Our Supreme Court expanded on this in *Dorfman*, explaining that, "[a]lthough the plaintiff's complaint contains allegations that the defendant, through its litigation conduct, improperly used and abused the judicial process, unless the plaintiff's *cause of action* challenges the purpose of the litigation or litigation procedure, these allegations do not suffice to establish an improper use of the judicial system. A claim of abuse of process may be premised on the improper use of a particular judicial procedure. But allegations of the improper use of judicial procedure do not satisfy the requirement that the plaintiff's *cause of action* must itself challenge the purpose of the underlying litigation or litigation procedure." (Emphasis added.) *Dorfman* v. *Smith*, supra, 342 Conn. 598–99. Otherwise, "any plaintiff could pierce the litigation privilege with any cause of action by merely including allegations that a defendant's conduct constituted an abuse of the judicial system."[6] Id., 599.

To reiterate, the fact that the plaintiff characterized the defendants' alleged conduct as meritless or frivolous or an abuse of the legal system does not bring it within the limited exception to the privilege. Unlike

claims of vexatious litigation or abuse of process, the cause of action of tortious interference with business expectancy does not challenge the purpose of an underlying judicial proceeding.[7] Indeed, our Supreme Court in *Rioux* already applied the relevant factors to this cause of action and concluded that absolute immunity bars claims based on tortious interference with business and contractual relationships.

Lastly, we note that there are other remedies available to address claimed abuses like these. See *Dorfman* v. *Smith*, supra, 342 Conn. 619 ("there are other remedies available to deter the alleged conduct"). The plaintiff, for example, could have brought an abuse of process or vexatious litigation claim to remedy or obtain recourse for the behavior of which it complains. See *DeLaurentis* v. *New Haven*, 220 Conn. 225, 264, 597 A.2d 807 (1991) ("Parties or their counsel who behave outrageously are subject to punishment for contempt of the court. Parties and their counsel who abuse the process by bringing unfounded actions for personal motives are subject to civil liability for vexatious suit or abuse of process."). The plaintiff chose not to do so.[8]

In sum, because the plaintiff's tortious interference with business expectancy claim is predicated on communications made during and relevant to prior judicial or quasi-judicial proceedings, the plaintiff's claim is barred by the litigation privilege.

## II

We turn next to the plaintiff's count asserting a violation of CUTPA. In support of its CUTPA claim, the plaintiff incorporates by reference the same allegations it makes in support of its tortious interference with business expectancy claim and further alleges that, among other things, the "defendants engaged in unfair methods of competition and unfair and deceptive acts to interfere with this sale of the Confirmit shares. They did so by filing for injunctions in both Connecticut and Norway on the false premise that [Caroline] genuinely sought to exercise her purported [ROFR]." The plaintiff further alleges, inter alia, that "[Alexander] and his associates have targeted Confirmit, interfering with its business through the intentional prolonging of the enforcement lien and uncertainty of the company's ownership as well as through their continued obstructionist litigation."

The parties make substantially similar arguments regarding this claim as they do with respect to the tortious interference claim. In particular, the defendants argue that the litigation privilege bars the plaintiff's CUTPA claim because it is premised on communications and conduct in prior litigation. Citing to numerous cases, the defendants argue that our courts uniformly have held that the litigation privilege applies to CUTPA claims based on communications made and

actions taken during the course of past litigation. The plaintiff counters that the trial court properly found that the litigation privilege does not bar the plaintiff's claim because the claims do not arise out of the content of statements or communications by the defendants in litigation. For largely the same reasons that we concluded in part I of this opinion that the litigation privilege bars the plaintiff's tortious interference claim, we conclude that the plaintiff's CUTPA claim also is barred by the privilege.

Courts in Connecticut consistently have applied the litigation privilege to CUTPA claims based on communications made during and relevant to a prior judicial proceeding. See, e.g., *Dorfman* v. *Smith*, supra, 342 Conn. 618 (CUTPA claim based on violation of Connecticut Unfair Insurance Practices Act barred by litigation privilege); *Simms* v. *Seaman*, supra, 308 Conn. 561–62 (discussing federal case law that consistently has held that CUTPA claims premised on false communications made during and relevant to underlying judicial proceeding are barred by litigation privilege); *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 727–29 (CUTPA claim against insurance companies was barred by litigation privilege); *Tyler* v. *Tatoian*, supra, 164 Conn. App. 86–87, 93–94 (CUTPA claim against attorney for communications made in course of prior judicial proceeding was barred by litigation privilege).[9]

Most recently, in *Dorfman* v. *Smith*, supra, 342 Conn. 582,[10] our Supreme Court considered whether a violation of CUTPA, based on a violation of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq., was subject to the litigation privilege. The plaintiff argued that absolute immunity would undermine the legislative intent of CUIPA, which the plaintiff argued was to hold insurers accountable for misrepresenting facts relating to coverage issues. Id., 617. The court observed that there was minimal case law regarding the litigation privilege as it pertains to a claim brought under CUIPA, but pointed to the wealth of case law regarding the applicability of the litigation privilege to CUTPA claims. Id., 618. In light of that precedent, the court held that "the litigation privilege bars CUTPA claims, like the claim at issue, premised solely on general allegations of intentionally false discovery responses . . . ." Id., 619. It further stated: "We recognize that the legislature intended to prohibit certain unfair and deceptive business practices by enacting CUTPA and CUIPA, but the plaintiff has not cited, and we have not discovered, any provision of these statutes that explicitly abrogates the common-law litigation privilege, which, historically, has been applied to false and malicious statements made during and relevant to judicial proceedings." Id., 620. The court qualified its holding by stating that "[t]his does not mean, however, that a defendant enjoys absolute immunity from all CUTPA claims under the litigation privilege, even those prem-

ised on a violation of CUIPA," leaving open the possibility that other CUTPA claims may not be barred by absolute immunity under the privilege. Id.

On the basis of our review of the specific allegations advanced in support of the plaintiff's CUTPA claim, in addition to our case law, including our Supreme Court's recent decision in *Dorfman*, we conclude that absolute immunity bars the plaintiff's CUTPA claim. In *Dorfman*, our Supreme Court focused its analysis on whether the "legislature intended to abrogate a party's absolute immunity from CUTPA claims based on a business practice of filing false discovery responses." Id., 618. In discovering no provision in CUTPA or CUIPA "that explicitly abrogate[d] the common-law litigation privilege" with respect to false and malicious statements made during and relevant to judicial proceedings, the court concluded that the litigation privilege barred the plaintiff's CUTPA-CUIPA claim. Id., 620. Although the court left open the possibility that the litigation privilege may not bar other CUTPA claims, it did so in the context of its consideration of whether a particular set of allegations in support of a CUTPA claim might constitute a claim for which the legislature intended to abrogate the privilege. See id.

Here, while making general public policy arguments for why the litigation privilege should not apply in this instance, the plaintiff does not argue that the legislature intended to abrogate the litigation privilege for the type of CUTPA claim that it has brought. The plaintiff's CUTPA claim in this case, which is premised largely on the defendants' alleged communications and conduct in prior judicial proceedings, including the alleged introduction of false and/or fabricated evidence and the alleged filing of false and/or frivolous actions and appeals, closely resembles the CUTPA claims that our courts routinely have held are barred by the litigation privilege. See, e.g., id., 618; *Bruno* v. *Travelers Cos.*, supra, 172 Conn. App. 727–29; *Tyler* v. *Tatoian*, supra, 164 Conn. App. 86–87, 93–94; see also footnote 9 of this opinion. As such, we discern no appropriate basis for treating the plaintiff's CUTPA claim in this case differently than courts consistently have treated CUTPA claims in other cases, especially when other available remedies exist to deter the alleged conduct. See part I of this opinion.

Because we conclude that the litigation privilege is applicable to the plaintiff's CUTPA claim in this case, and because the plaintiff's CUTPA claim is premised in large part on communications made during and relevant to prior judicial proceedings; see part I of this opinion; we conclude that it, too, is barred by the litigation privilege.

### III

As a final matter, the plaintiff argues that the litigation

privilege does not bar its claims because they include allegations unrelated to communications made in the course of judicial proceedings. Although the complaint does include allegations of extrajudicial conduct, the complaint is permeated with allegations pertaining to the defendants' communications and participation in prior judicial proceedings, which are both central to the plaintiff's claims and inextricably intertwined with the allegations of extrajudicial conduct. Under these circumstances, we conclude that the plaintiff's claims are barred by the litigation privilege. To hold otherwise would permit parties to proceed with claims that otherwise are barred by the litigation privilege simply by adding allegations concerning conduct that is outside the privilege. Such a result would significantly undermine the objective the privilege was designed to promote.[11] See *Chadha* v. *Charlotte Hungerford Hospital*, supra, 272 Conn. 786 (like sovereign immunity, doctrine of absolute immunity "protects *against suit* as well as liability—in effect, against having to litigate at all" (emphasis added; internal quotation marks omitted)).

The judgment is reversed and the case is remanded with direction to grant the defendants' motion to dismiss the plaintiff's complaint in its entirety.

In this opinion the other judges concurred.

[1] The plaintiff claims that this court should dismiss the appeal for want of jurisdiction because the defendants have not offered any basis for dismissing the action as a whole. They contend that the defendants' arguments "refer to only 7 of the complaint's 173 paragraphs." We are not persuaded. The defendants' motion to dismiss clearly pertains to the entire complaint, as they requested that the court "[dismiss] the case in its entirety or strik[e] the offending allegations." The crux of the defendants' argument is that the plaintiff's complaint improperly centers around prior litigation and they are thus absolutely immune from suit. The defendants have set forth a colorable claim of absolute immunity. See *Chadha* v. *Charlotte Hungerford Hospital*, 272 Conn. 776, 787, 865 A.2d 1163 (2005) (like colorable claim of sovereign immunity, to protect against threat of suit, colorable claim of absolute immunity based on participation in judicial and quasi-judicial proceedings gives rise to immediately appealable final judgment). As a result, there are no grounds for dismissing the defendants' appeal.

[2] We note that a lack of built-in restraints by virtue of a cause of action's stringent requirements is not always dispositive of whether the litigation privilege applies to a particular claim. See *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 630–31 (absolute immunity did not bar claim of employer retaliation). Nevertheless, whether a cause of action has built-in safeguards that protect against inappropriate retaliatory litigation remains a factor. See *Scholz* v. *Epstein*, supra, 341 Conn. 21 ("[u]nlike a claim of vexatious litigation, a claim of statutory theft does not provide the same level of protection against the chilling effects of a potential lawsuit" (footnote omitted)).

[3] "Vexatious litigation requires a plaintiff to establish that: (1) the previous lawsuit or action was initiated or procured by the defendant against the plaintiff; (2) the defendant acted with malice, primarily for a purpose other than that of bringing an offender to justice; (3) the defendant acted without probable cause; and (4) the proceeding terminated in the plaintiff's favor." *Rioux* v. *Barry*, supra, 283 Conn. 347.

[4] These factors apply regardless of whether the action is against an attorney, party opponent, or witness. See *Dorfman* v. *Smith*, supra, 342 Conn. 592 n.3.

[5] General Statutes (Rev. to 2013) § 31-290a provides in relevant part: "(a) No employer who is subject to the provisions of this chapter shall discharge, or cause to be discharged, or in any manner discriminate against any employee because the employee has filed a claim for workers' compensation benefits or otherwise exercised the rights afforded to him pursuant to the

provisions of this chapter.

"(b) Any employee who is so discharged or discriminated against may . . . (1) Bring a civil action in the superior court . . . for the reinstatement of his previous job, payment of back wages and reestablishment of employee benefits to which he would have otherwise been entitled if he had not been discriminated against or discharged and any other damages caused by such discrimination or discharge. The court may also award punitive damages. Any employee who prevails in such a civil action shall be awarded reasonable attorney's fees and costs to be taxed by the court . . . ." See also *MacDermid, Inc.* v. *Leonetti*, supra, 310 Conn. 617–18 n.1.

[6] In *Scholz*, our Supreme Court further stated: "[T]o the extent the plaintiff is arguing that he alleged in his complaint that the defendant improperly used the courts, in that the defendant's conduct in the underlying litigation constituted an abuse of process, such an allegation is not sufficient to bar the litigation privilege, but, rather, the plaintiff was required to, but did not, set forth sufficient allegations to establish a cause of action for abuse of process." *Scholz* v. *Epstein*, supra, 341 Conn. 15 n.5.

[7] It bears mentioning that many, if not the majority, of the plaintiff's allegations alleging frivolous or meritless litigation arise out of lawsuits commenced by the plaintiff itself. The complained of litigation primarily concerns the defendants' conduct in defense of those lawsuits and the prosecution of appeals. Thus, the majority of the allegations do not concern the defendants' use of the legal process against the plaintiffs in order to accomplish a purpose for which it was not designed; rather, they largely concern the defendant's participation in litigation the plaintiff initiated.

[8] At oral argument before this court, the plaintiff's counsel argued that the complaint set forth the necessary allegations to support an abuse of process claim. A simple review of the plaintiff's complaint, however, discloses that it did not assert such a claim. The plaintiff's two count complaint clearly captions its claims "Tortious Interference with Business Expectancy" and "Violation of the Connecticut Unfair Trade Practices Act."

[9] Connecticut federal courts similarly have concluded that the litigation privilege bars CUTPA causes of actions that are premised on communications made during prior litigation. See, e.g., *Bailey* v. *Interbay Funding, LLC*, Docket No. 3:17-CV-1457 (JCH), 2018 WL 1660553 (D. Conn. April 4, 2018); *Weldon* v. *MTAG Services, LLC*, Docket No. 3:16-CV-783 (JCH), 2017 WL 776648 (D. Conn. February 28, 2017); *Costello* v. *Wells Fargo Bank National Assn.*, Docket No. 16-CV-1706 (VAB), 2017 WL 3262157 (D. Conn. July 31, 2017), aff'd, 739 Fed. Appx. 77 (2d Cir. 2018).

[10] *Dorfman* was decided after oral argument in this appeal. Following oral argument, both the plaintiff and the defendants filed notices of supplemental authority pursuant to Practice Book § 67-10 on April 13, 2022.

[11] Because the issue was not raised or decided below, we express no view as to whether the complaint, in the absence of the offending allegations, is sufficient to state claims for tortious interference with business expectancy or a violation of CUTPA.